COURT OF APPEALS
DECISION
DATED AND FILED

October 31, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP2459**

Cir. Ct. No. **2016CV76**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

JOSEPH EBERT, DALE EBERT, ARLIS EBERT
AND RONALD C. EBERT,

PLAINTIFFS-APPELLANTS,

V.

INNSWOOD WHITETAILS, LLC AND FRANK
B. RASCH,

DEFENDANTS-RESPONDENTS.

---

APPEAL from a judgment of the circuit court for Monroe County: MARK L. GOODMAN, Judge. *Affirmed in part; reversed in part and cause remanded with directions.*

Before Blanchard, Kloppenburg and Graham, JJ.

¶1 GRAHAM, J. This is an appeal of a final judgment resolving property disputes between the owners of two adjacent parcels of land in Monroe

County. The parties dispute the location of a portion of an easement, as well as the width of the entire easement. They also dispute the boundary line between their parcels.

¶2 Joseph, Dale, Arlis, and Ronald Ebert (the "Eberts") contend that the circuit court erred by "relocating" the southern terminus of the eastern fork of the easement (which we refer to as the "disputed portion"), and by "limiting" the entire easement's width. We conclude that the court did not erroneously exercise its discretion when it established the location of the disputed portion of the easement and the entire easement's width.

¶3 The Eberts also contend that the circuit court erred by relieving Innswood Whitetails, LLC and Frank Rasch (collectively, "Rasch") of their unambiguous stipulation that the "historic fence line" would be the property boundary. We agree that the court erred by diverging from the unambiguous stipulation between the parties when it set the boundary line between the parcels.

¶4 Accordingly, we affirm in part, reverse in part, and remand to the circuit court for proceedings consistent with this opinion.

Background

¶5 This case has a lengthy and involved procedural history. There were two separate trials, issues that appeared to have been resolved were later revived, key witnesses testified on multiple occasions, and the circuit court ultimately issued three sets of findings of fact and conclusions of law. For ease of reading, we summarize the most pertinent facts here and then present additional evidence, testimony, and findings as needed in the discussion section below.

2

¶6      This dispute concerns two adjacent parcels of land in Monroe County.  Innswood owns the parcel to the north (the "Rasch Property"), and Innswood's sole members, Frank Rasch and his wife, live on the property.  The Eberts own the wooded parcel to the south (the "Ebert Property"), and the Ebert family has used it for grazing cattle, hunting, picnics, and, most pertinent to this appeal, logging.

¶7      Both properties were originally part of a single parcel.  In 1944, the Eberts' predecessors-in-title divided the property in two and sold the northern parcel to Rasch's predecessors-in-title.  As part of the sale, the Eberts' predecessors forever reserved "the right of ingress and egress over and across the [Rasch Property] by vehicle, on foot, team and otherwise" for themselves and "their heirs, administrators, and assigns."

¶8      The deed did not identify the location of this easement, but at some point after the sale, the Eberts' predecessors established its general location through use.  For the reader's reference, we attach "Exhibit No. 3," an aerial photograph admitted during the first trial that contains (among other things) a rough sketch of the easement's location as established by use.  The easement has the appearance of an upside-down Y.  Starting at the north of the Rasch Property, there is a single route of travel that follows Rasch's driveway, passes between Rasch's home and outbuildings, and reaches a three-way junction, or Y intersection.  One branch turns to the east, travels southeast through pastures and fields, and eventually reaches the eastern portion of the Ebert Property.  (The precise location of the terminus of this eastern branch is one subject of this appeal.)  The western branch travels west and southwest from the junction, eventually reaching the western portion of the Ebert Property.

¶9      The Eberts grew up using the Ebert Property and eventually inherited it. Rasch purchased the Rasch Property in 1987. Starting in 2005 or 2006, Rasch began to take actions that interfered with the Eberts' use of their easement. Among other things, Rasch put up a gate and attempted to change the path of the easement so that it would not pass near his house. The Eberts objected to Rasch's proposed change.

¶10     In addition to their dispute over the easement, the parties also disputed the boundary line between their parcels. According to the 1944 deed, the property line consists of straight lines. The line starts at the parties' shared western boundary, travels due east, takes a 90 degree turn to the north, and then takes a 90 degree turn to the east until it hits the shared eastern boundary. The parties have not, however, consistently recognized the deeded line as their boundary. Historically, there was a fence between the parcels, and the parties and their predecessors treated at least some portions of that curving fence line as the boundary. Exhibit No. 3 depicts the straight lines from the deed and the curved line that the Eberts contend is the historical fence line.

¶11     The Eberts initiated this lawsuit in 2016. Just prior to a scheduled bench trial, the parties entered into a stipulation to resolve the boundary dispute. They stipulated that the "boundary will be placed in the location of the historic fence line," and that "in general," the location of the historic fence line was "as depicted on Exhibit No. 3." The parties further stipulated that a surveyor "will establish … the location of the historic fence line." Given their stipulation about the boundary, the parties agreed that the sole remaining disputes for trial related to the easement.

¶12    After the first trial, the circuit court determined that the location of the easement had been established by use "in the area described as the historic easement location on Exhibit #3" and that the court "cannot relocate the easement." It further determined that Rasch had intentionally interfered with the easement and ordered him to stop doing so. Finally, the court permitted the Eberts to "obtain a survey to obtain a description for the easement," and it retained jurisdiction of the matter "to amend this judgment to include such legal description." The court did not address the location of the boundary because the parties believed that this issue had been resolved by way of the stipulation quoted above.

¶13    After the first trial, the parties hired a surveyor, Gary Dechant, to provide legal descriptions of both the easement and the boundary. Dechant surveyed the established easement and the existing fence line (the "Dechant Survey"), and he prepared a legal description for quit claim deeds, which would establish ownership on both sides of the boundary. These deeds were never executed because the parties disputed the easement's width and Rasch refused to sign them. The circuit court scheduled a second trial to address the dispute about the easement's width.

¶14    At the outset of the second trial, Rasch informed the circuit court that two additional disputes needed to be addressed, one regarding the easement and the other regarding the boundary line. First, Rasch asked the court to address the location of the southern terminus of the eastern branch (the "disputed portion") of the easement, where, according to Dechant, there was no evidence of an existing traveled way. Second, Rasch asked the court to address the location of the property boundary on the western side of the parcels where, according to Rasch, there was no evidence of a historic fence line. The Eberts argued that these

disputes had already been decided in the first trial or by stipulation, but the court agreed to hear the evidence.

¶15 Regarding the location of the disputed portion of the easement, the Eberts argued that the centerline should pass through the center of Rasch's alfalfa field. Rasch argued that the centerline should pass south of the field.

¶16 Regarding the boundary, the Eberts presented the Dechant Survey, which depicts a line labeled "EXISTING FENCING" that appears to essentially track the hand-sketched "location of historic fence line" depicted on Exhibit No. 3. Rasch disputed the existence of any historic fence line to the west of a corner post noted on the Dechant Survey on the basis that the fencing that Dechant found west of the corner post differed in quality from the historic fence line to the east of the corner post. Rasch proposed that east of the corner post, the boundary should track the historic fence line, but that in the absence of a proven fence line west of the corner post, the boundary should track the line created by the deed.

¶17 The circuit court did not make any rulings at the close of the second trial. After the parties submitted written closing arguments, the court signed the proposed findings of fact, conclusions of law, and amended judgment submitted by Rasch without amendment or supplementation.[1]

---

[1] The amended judgment states that the parties "stipulated that the Court would address the parties' Stipulation filed January 12, 2017 to determine the location of the historic fence line which is the boundary between the parties' lands." Rasch's brief mentions this portion of the amended judgment in passing, but Rasch does not provide any citation to a second stipulation in the record, nor does he make any developed argument about the effect that a second stipulation would have on this dispute. It appears that the amended judgment's reference to a second stipulation must have been in error since neither party references any of the purported second stipulation's provisions and we can locate no such stipulation in the record.

¶18   The circuit court determined that, since there was no evidence of an existing traveled way at the disputed portion of the easement, it would place the disputed portion in the location that would not bisect Rasch's alfalfa field.  It further determined that the entire easement would be 12 feet wide, consistent with the width of the widest portion of the existing traveled way, and that such width was sufficient for ingress and egress including for logging.  Finally, turning to the boundary line, the court concluded that there was insufficient evidence of the historic fence line west of the corner post and adopted Rasch's proposal.

Discussion

¶19   The Eberts contend that the circuit court erred by "relocating" the disputed portion of the easement's eastern branch to Rasch's preferred route, by "limiting" the width of the easement to 12 feet (which they argue is too narrow to accommodate modern logging equipment), and by determining that the property boundary would follow the deed line on the west end of the property.  We address the location and width of the Eberts' easement over the Rasch Property in Section I, and then in Section II, we turn to the boundary dispute.

I.  The Easement

¶20   We now explain why we conclude that the circuit court did not err by "relocating" the disputed portion of the easement or by "limiting" the width of the entire easement to 12 feet.  On the first issue, contrary to the Eberts' arguments, the court did not "relocate" the disputed portion of the easement; instead, having found that there was no evidence of an existing traveled way on the disputed portion of the easement, the court properly used its equitable authority to set its location.  On the second issue, the court found that a 12 foot

easement would be sufficient to accommodate logging (the historical use requiring the greatest width), and this finding is not clearly erroneous.

¶21    We begin our analysis by summarizing the applicable standards for determining the location and width of an express easement, and then we apply these principles in turn to the Eberts' arguments about location and width.

¶22    "An easement is an interest in property that is in another's possession." *Berg v. Ziel*, 2015 WI App 72, ¶13, 365 Wis. 2d 131, 870 N.W.2d 666. It creates two distinct property interests, the dominant estate and the servient estate. *Id.* The dominant estate benefits from the privileges granted by the easement, and the servient estate must allow the dominant estate to exercise those privileges. *Id.*

¶23    The easement in this case is an "express easement," meaning that it was created by a written grant in a deed. *Id.*, ¶14. Courts resolve disputes about the location and width of an express easement by interpreting the terms of the deed. *Id.* As with the interpretation of most written instruments, a court's goal is to ascertain the parties' intent. *Id.*

¶24    The location and width of an easement may be expressly stated in the deed, and if the deed is unambiguous, the court will look no further. *Konneker v. Romano*, 2010 WI 65, ¶23, 326 Wis. 2d 268, 785 N.W.2d 432. "When an easement is granted without defined limits …, the location may be subsequently fixed [either] by an express agreement of the parties or by an implied agreement arising out of the use of the easement by the grantee and acquiescence on the part of the grantor…." *Berg*, 365 Wis. 2d 131, ¶16 (quoting 25 AM. JUR. 2d *Easements and Licenses in Real Property* §§ 54-56 (2014)).

¶25 If the precise location or width of the easement is not expressly defined in the deed, then the court will look to extrinsic evidence, including the parties' subsequent agreements and conduct, as evidence of the parties' intent. *See id.,* ¶16; *Spencer v. Kosir*, 2007 WI App 135, ¶¶13-14, 301 Wis. 2d 521, 733 N.W.2d 921 (affirming the circuit court's determination of location and width of an easement based on extrinsic evidence); *see also Berg*, 365 Wis. 2d 131, ¶14 ("[T]he practical construction given to it by the acts of the parties is of great force in determining its construction."). When the court looks to extrinsic evidence to interpret ambiguous language in a deed, "the intent behind the language presents a question of fact." *Konneker*, 326 Wis. 2d 268, ¶23. A circuit court's factual findings will be affirmed unless they are clearly erroneous. WIS. STAT. § 805.17(2) (2017-18).

## A. Easement Location

¶26 We now address the location of the disputed portion of the easement. The Eberts argue that the circuit court erred by "relocating" the disputed portion of the easement. As the Eberts correctly point out, the general rule is that a court cannot relocate an established easement without the consent of all interested parties.[2] In *Berg*, for example, an existing access road had served as an easement's path for decades, and then the circuit court relocated the easement over the servient estate's objection. *Berg*, 365 Wis. 2d 131, ¶1. On appeal, we

---

[2] Although it has no application in this case, there is authority suggesting that the general rule may not apply when the easement must be redefined or relocated because the "original easement route cannot be used to accomplish the purpose of the easement." *See Atkinson v. Mentzel*, 211 Wis. 2d 628, 641, 566 N.W.2d 158 (Ct. App. 1997); *see also Mnuk v. Harmony Homes, Inc.*, 2010 WI App 102, ¶36, 329 Wis. 2d 182, 790 N.W.2d 514 (adopting RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 7.10(1) (Am. Law Inst. 2001)).

concluded that the court did not have authority to set a new location because "[u]nder any reasonable view of the evidence," the parties had already "selected the existing access road as the easement's location." *Id.*, ¶¶17-19.

¶27 However, in those instances where the location of an easement is not defined—either in the deed or by use or agreement—"a reasonably convenient and suitable way is presumed to [have been] intended." *Atkinson v. Mentzel*, 211 Wis. 2d 628, 641, 566 N.W.2d 158 (Ct. App. 1997) (quoting *Werkowski v. Waterford Homes, Inc.*, 30 Wis. 2d 410, 417, 141 N.W.2d 306 (1966)). In such a situation, the court has the equitable power "to affirmatively and specifically determine its location, after considering the rights and interests of both parties." *Spencer*, 301 Wis. 2d 521, ¶13; *see also Atkinson*, 211 Wis. 2d at 641-42. "[T]he reasonable convenience of both parties is of prime importance," and the court "cannot act arbitrarily and must proceed with due regard for the rights of the parties." *Atkinson*, 211 Wis. 2d at 642.

¶28 We conclude that *Berg*'s rule against relocating an easement does not govern the outcome in this case because the circuit court did not "relocate" any portion of an easement path that had been identified in the deed or established by use. Since the deed was silent as to the easement's location, the court properly looked to extrinsic evidence, and where there was evidence of an existing traveled way, the court followed that path. For the disputed portion of the easement, however, the court found that there was "no evidence of an existing traveled way," and we conclude that this finding is not clearly erroneous. It is consistent with the testimony of the surveyor, Dechant, who testified that "[o]n that southerly, very southerly end of the easement, it wasn't very clear. There was no clear cut path that anyone was using." And the finding of fact is also consistent with the

testimony of Ron Ebert, who testified that the location of the disputed portion had changed over the years.[3]

¶29     Since there was no evidence of an existing traveled way at the disputed portion, there was nothing for the circuit court to move or relocate. Instead, in the absence of evidence of an existing traveled way, the court properly used its equitable authority to set the location of the disputed portion of the easement. *See* ***Berg***, 365 Wis. 2d 131, ¶¶17-19 (declining to relocate an easement when conclusive evidence established its location); ***Atkinson***, 211 Wis. 2d at 641-42 (noting that in the absence of a defined location, a court may determine an easement's location upon consideration of the equities). The court considered the alternative paths proposed by Rasch and the Eberts and their relative rights and interests, and it ultimately selected the location proposed by Rasch.

¶30     The Eberts contend that Rasch's preferred path "could not have been the historical location of the easement" because there were trees in the path, but this argument goes nowhere for two reasons. First, the only testimony regarding these trees was that they were "younger pines maybe three feet high," and it is undisputed that the Eberts had not actually used the eastern path in the recent past. Accordingly, on this record, the circuit court was not obligated to find that Rasch's proposed path could never have been used to access the Eberts' property. Second and more importantly, absent evidence showing the location of an established path, the easement had to be placed somewhere, and the court did not err by

---

[3] Specifically, Ron Ebert testified that at one point the easement went through the middle of the field, but that the Eberts later agreed that Rasch could reroute it to minimize the impact on the field.

selecting the location it did after considering the rights and interests of both parties. *See Berg*, 365 Wis. 2d 131, ¶¶17-19; *Atkinson*, 211 Wis. 2d at 641-42.

¶31    Finally, the Eberts argue that the circuit court should have given more weight to the fact that Rasch's proposal includes a sharper turn that makes travel more difficult. However, it was within the court's discretion to balance the rights and interests of the parties. *See Spencer*, 301 Wis. 2d 521, ¶13. Equitable remedies, such as the determination of the location or width of an easement, are reviewed for an erroneous exercise of discretion. *Id.* A court properly exercises its discretion if it applies the appropriate law and the record shows that there is a reasonable factual basis for its decision. *Id.* Here, as shown above, the circuit court applied the appropriate law and the record shows a reasonable factual basis for its decision.

## B. Easement Width

¶32    We now turn to the parties' dispute over the easement's width. As with the location of the Eberts' easement over the Rasch Property, the width of the easement was not defined in the deed. The Eberts argue that the easement should be 66 feet wide (which they contend is the width of a town road) or, if not that, 40 feet wide (which they contend is the minimum width necessary to accommodate modern logging equipment).

¶33    When an easement's width is not expressly set forth in a written instrument, the court has equitable power to determine the width necessary to accomplish the purpose for which it was granted. *Spencer*, 301 Wis. 2d 521, ¶¶13-14. That does not mean, however, that "all accommodations which serve the purpose of the easement must be allowed." *Atkinson*, 211 Wis. 2d at 645. The test is "whether the owner of the dominant estate can reasonably use the property

as intended." *Id.* at 645-46. "Once this purpose is served, further expansion of the easement is neither necessary nor warranted," even if it would make the dominant estate holder's use "more convenient." *Id.* at 646.

¶34    The Eberts rely on *Atkinson*, which, they assert, stands for the proposition that the width of an easement should be expanded "to accommodate full use of the dominant estate" but cannot be restricted in a way that "inhibits full use of the dominant estate." Assuming but not deciding that this is an accurate summary of *Atkinson*, that case does not help the Eberts because the circuit court found, among other things, that a 12-foot easement would be sufficient for logging activity, the historical use calling for the greatest width. Specifically, the court found that the existing traveled way is no wider than 12 feet; that there was no evidence that it had ever been any wider; and that it had been used for ingress and egress for all intended uses of the Ebert Property, including logging, and has been sufficient for those purposes. These findings are supported by evidence in the record and are not clearly erroneous.

¶35    Although there was testimony suggesting that a wider easement would be "ideal" because it would permit two-way traffic and allow extra space for snow removal, that testimony did not persuade the circuit court that a wider easement was necessary to allow the Eberts to use the property as intended. *See Atkinson*, 211 Wis. 2d at 645-46.

¶36    We glean from the briefing that the Eberts' position may be motivated by concern that Rasch may consider placing obstacles just outside of the easement to prevent the Eberts from using the easement for logging purposes. The Eberts may find comfort in a concession made by Rasch's attorney during the course of the second trial that, under Wisconsin law, the owner of a servient estate

cannot place obstacles outside of the easement that unreasonably obstruct the easement's use.[4]

¶37 In sum, we conclude that the circuit court did not erroneously exercise its discretion when it established the location of the disputed portion of the easement and the entire easement's width.

## II. Boundary Line

¶38 We now turn to the parties' dispute about the boundary line. We conclude that the circuit court erred when it departed from the parties' unambiguous stipulation and used the line established in the deed, rather than the historic fence line surveyed by Gary Dechant, as the boundary line to the west of the corner post.

¶39 A stipulation is a contract made in the course of a judicial proceeding. *Ceria M. Travis Acad., Inc. v. Evers*, 2016 WI App 86, ¶14, 372 Wis. 2d 423, 887 N.W.2d 904. As with the interpretation of other contracts, the interpretation of a stipulation is a question of law, which is reviewed without deference to the circuit court. *Keller v. Keller*, 214 Wis. 2d 32, 37, 571 N.W.2d

---

[4] Specifically, Rasch's attorney made the following comments during the second trial:

> [W]hen you have an easement [that is] ten feet wide, 30 feet wide, the servient land owner [] can't build a wall that would prevent reasonable use of the easement. In other words, they can't create impediments that would be in interference. And we know Mr. Rasch has been ordered not to interfere with use of the easement. I think what is relevant is how wide does the easement need to be for travel. And if it's used for particular purposes, whether it's wide loads or something like that, ... he can't put another [object] that would interfere with it. So there has to be a reasonable cushion outside of the actual easement width that way in order for him to not be interfering with use.

182 (Ct. App. 1997). The court should seek a construction which will effectuate what appears to have been the intention of the parties, as expressed by the words they chose to use when memorializing their agreement. *Duhame v. Duhame*, 154 Wis. 2d 258, 264, 453 N.W.2d 149 (Ct. App. 1989).

¶40 The pertinent portion of the stipulation provides as follows:

> The parties stipulate that they have reached an agreement on the boundary issue. The parties agree that the boundary will be placed in the location of the historic fence line.

> The parties further agree that they will split the cost of the survey to provide the description necessary to generate the quit claim deeds, which both parties agree they will sign to effectuate this agreement. The survey will establish the line in the location of the historic fence line. The parties agree that in general the location of the historic fence line is as depicted on Exhibit No. 3.

¶41 Although the parties disagree about whether aspects of the stipulation are ambiguous, the central agreement of the stipulation is unambiguous: the "historic fence line" will be the boundary line. The stipulation expressly provides that "the boundary will be placed in the location of the historic fence line" and that "[t]he survey will establish the line in the location of the historic fence line." Rasch argues that the stipulation is ambiguous regarding the location of the historic fence, but we reject this argument. According to the express language of the stipulation, there was no ambiguity about location because the precise location would be resolved by the surveyor, Gary Dechant.

¶42 The Dechant Survey, admitted as "Exhibit No. 4" during the second trial, did identify the location of the historic fence line. The survey includes a cross-hatched line noted in the legend as "EXISTING FENCING—FAIR TO POOR CONDITION." That cross-hatched line is Dechant's determination of the

historic fence line, and it traverses the entire width of the boundary between the Rasch Property and the Ebert Property. During his testimony, Dechant specifically agreed that he was "able to find enough remnants of the fence that [he] could accurately survey the line."

¶43 Rasch argues that Dechant improperly drew the western portion of the historic fence line "simply … based on the Eberts' direction," but that assertion is contradicted by Dechant's testimony and is not supported by any other evidence. Dechant testified that he personally inspected fencing in the location where he drew the fence line: "I met with Eberts again where they said they found some fencing and I brought my metal detector out there, and we did find some remnants of pieces of fencing, and that is what I show as the dark line with the X's on it showing where we did find the actual fencing."

¶44 Even so, the circuit court asserted as an unexplained "conclusion of law" that "there is insufficient evidence to establish the existence of a historic fence line heading west from the corner post." Ordinarily we would defer to such an assertion if it were presented as a finding of fact and there was supporting evidence. However, we conclude that this "conclusion of law" is unsupported and erroneous for two related reasons.

¶45 First, it is directly contradicted by the testimony of Dechant, who was charged by the stipulation to survey the fence line. The circuit court did not identify any deficit in the testimony, nor did it find that Dechant lacked credibility.

¶46 Second, it is also contradicted by the court's own findings of fact, which are supported by the record and not clearly erroneous. Specifically, the circuit court found that "Gary Dechant prepared his survey of the historic fence line"; that "[t]he parties have agreed upon the eastern portion of the historic fence

16

line" up to the corner post; that west of the corner post, Dechant located "remnants of fencing pieces" "through the use of a metal detector"; and that, "[b]ased upon those remnants of pieces buried in the ground, is where the western portion of the historic fence line is shown" on Exhibit No. 4. The court specifically found that "[t]he historic fence line as shown on the survey, Exhibit 4, is the northern boundary of [the Ebert Property]."

¶47 To be sure, Rasch directs our attention to other facts found by the circuit court, which show that the historic fencing Dechant found west of the corner post was of a different quality than the historic fencing Dechant found to the east of the corner post. Specifically, the court found that the fencing on the western part of the property consisted of a single strand of barbed wire buried under mud or rock, and that the fencing on the eastern side of the property consisted of three to four strands of barbed wire that are standing and intact. However, these facts are not germane to our analysis because the parties stipulated to the "historic" fence line—not to any "current" or "standing" fence line. Similarly, without explaining why it matters, Rasch argues that there is no evidence that the Eberts ever logged the land north of the deed line. Again, this is not material because the parties stipulated to the historic fence line, not to any line where logging stopped.

¶48 In light of this record, we interpret the court's "conclusion of law" to have been stated in error.

¶49 In sum, the stipulation unambiguously provides that the boundary would be placed on the historic fence line as established by the survey, and the survey identified the historic fence line. In setting a portion of the boundary on the deed line—a location where Rasch concedes that there was no historic fence

line—the circuit court improperly diverged from the unambiguous agreement of the parties.

¶50    The court's diversion from the unambiguous language of the stipulation may have been based on a mistaken belief that Rasch had a right under the stipulation to withhold his approval of the survey's results.  The stipulation does not require the parties' approval of the surveyor's conclusions, nor does it give either party a veto over any survey results.  Instead, the stipulation provides that "the survey" would establish the location of the historic fence line, and the Dechant Survey has done so here.  On this record, setting the boundary on the line marked by the surveyor as "EXISTING FENCING" appears to be the only option for carrying out the unambiguous intent of the parties' stipulation.

¶51    We direct that, on remand, the circuit court conduct proceedings necessary to amend the legal descriptions of the parties' properties to conform the boundary line to that described in the Dechant Survey.

Conclusion

¶52    For all of these reasons, we conclude that the circuit court properly exercised its discretion when it established the location of the disputed portion of the easement and the entire easement's width.  We further conclude that the court erred by diverging from the unambiguous stipulation of the parties when it set the boundary line between the parcels.  Accordingly, we affirm in part, reverse in part, and remand for the court to hold proceedings to amend the legal descriptions of the parties' properties to conform with the Dechant Survey.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

Not recommended for publication in the official reports.



Described Line

Location of Historic Line Fence

## Legend

☐ section lines
☐ tax_parcels

660    330    0 Feet

FILED

FEB 1 4 2017

CLERK OF CIRCUIT COURT
MONROE COUNTY WISCONSIN

N
W    E
S

EXHIBIT

3